UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

LAUREN WEBB, Individually )
and on behalf of all others similarly )
situated, *et al*., )
            )      No. 6:23-cv-211-REW-HAI
       Plaintiffs, )
            )      OPINION & ORDER
v. )
            )
CSX TRANSPORTATION, INC. )

       Defendant.

\*\*\* \*\*\* \*\*\* \*\*\*

Plaintiffs Lauren Webb, Debbie Francisco, and Lawrence Thayer bring this individual and putative class action lawsuit against Defendant CSX Transportation, Inc. (CSX). *See* DE 19 (Am. Comp.). Before the Court is CSX's motion to dismiss DE 19's claims and strike its class action allegations. *See* DE 25 (Motion to Dismiss and Strike); DE 25-1 (Memo in Support). For the following reasons, the Court **GRANTS in part** and **DENIES in part** DE 25.

## I. BACKGROUND

Drawing from the allegations of the pleading: On November 22, 2023, at around 2:30 p.m., a train owned and operated by CSX derailed while traveling through the town of Livingston in Rockcastle County, Kentucky. *See* DE 19 ¶¶ 1, 11, 32. The derailed cars were carrying molten sulfur, magnesium hydroxide, and methanol. *See id.* ¶ 32. The derailment caused two cars containing molten sulfur to breach, resulting in sulfates "scatter[ing] across the soil and . . . fall[ing] into the local waterways." *See id.* ¶ 44. The breached cars also caught fire and began emitting, from the burning contents, a continuous smoke plume of sulfur dioxide gas ($SO_2$), a toxic environmental pollutant. *See id.* ¶¶ 8, 37. As the fire continued to burn, this thick $SO_2$ smoke

quickly spread and created near white-out conditions in the surrounding area.  *See id.* ¶¶ 3–5, 39, 42.

Initially, CSX told first responders and local residents "that there was no cause for concern, as the railcars were carrying substances that were 'food grade,'" omitting any mention of $SO_2$.  *See id.* ¶ 37.  However, as the fire continued to burn (and more and more $SO_2$ continued to blanket the area), CSX began encouraging Livingston residents to evacuate their homes at around 6:00 p.m., though this recommendation involved "mixed messages" that were "not communicated to all impacted residents."  *See id.* ¶¶ 39–41.  A second round of evacuations then occurred "in the middle of the night," this time "with a much more urgent message conveying the severity of the situation."  *Id.* ¶ 40.  At both stages, evacuating residents, Plaintiffs included, were met with "near white-out" levels of $SO_2$ smoke.  *See id.* ¶ 42.

CSX representatives and local first responders extinguished the fire approximately 24 hours after derailment, but the smoke plume remained present in and around Livingston until the evening of November 24.  *See id.* ¶ 43.  A CSX investigation subsequently concluded that the derailment was caused by an overheated wheel bearing on one of the railcars.  *See id.* ¶ 11.  On November 25, CSX removed the derailed cars from the track and staged at least some of them— including the two breached cars, which still contained molten sulfur—on nearby land in Livingston, where they remained for over two months.  *See id.* ¶¶ 45, 126.  During that time, rain and snowstorms caused additional sulfuric gasses to escape from the staged equipment through the process of "off-gassing."  *See id.* ¶ 126.  Furthermore, upon Plaintiffs' information and belief, "in the days and weeks following the derailment, CSX dumped some of the molten sulfur throughout [] the community, including along the sides of heavily traveled roads."  *Id.* ¶ 127.

The three named plaintiffs—Lauren Webb, Debbie Francisco, and Lawrence Thayer—are all proximal Livingston residents that claim to have been personally harmed by the derailment in each of the following ways:

- Webb was a local firefighter who assisted in the evacuation and spent "many hours" at the crash site. *See id.* ¶ 81. She alleges her exposure to $SO_2$ caused "sore throat, trouble breathing, headaches and a respiratory infection[,]" as well as "ongoing pulmonary irritation and fear for the long-term consequences to her health" given her status as an "immunocompromised individual." *See id.* ¶¶ 82–83.

- Francisco lived approximately one mile from the derailment and was forced to evacuate her home that evening after it "was surrounded by thick, toxic smoke." *See id.* ¶ 85–86. As a result, she developed "a burned throat, irritated nose, and postnasal drip." *Id.* ¶ 87. Francisco further claims to suffer from ongoing effects such as "a lingering cough, distinct lack of energy, sore throat, and headaches," as well an "ongoing fear for the long-term consequences to her health." *Id.*

- Thayer lived two miles from the derailment site and, due to physical limitations, required transportation in the event of an evacuation. *See id.* ¶¶ 88–89. Thayer sat in his home awaiting promised instructions and/or help until 1:00 a.m., when a CSX representative finally came to transport him to a local hotel. *See id.* ¶¶ 90–91. At that point, Thayer "was already struggling to breathe[,]" and due to low visibility from ambient smoke, the CSX rep had to pull over several times before reaching the hotel. *See id.* ¶ 92. In the following days, Thayer alleges he received an unspecified diagnosis "consistent with sulfur dioxide exposure," and further claims that he continues to "suffer[] from breathing complications and is undergoing further medical evaluation." *See id.* ¶ 93.

DE 19 also alleges that Plaintiffs' "properties were contaminated with toxic fumes, smoke, and odors, and their soil and water were contaminated with sulfates, decreasing property value and causing loss of use and enjoyment." DE 31 at 10; *see* DE 19 ¶¶ 19, 44, 49, 60, 141–54.

Plaintiffs initiated the present action on November 29, 2023, and filed an Amended Complaint (DE 19) on February 6, 2024, seeking both individual relief and class action relief on behalf, primarily, of all residents that resided or owned property within fifteen miles of the

derailment site. *See* DE 19 ¶ 99.[1]  The Amended Complaint asserts claims of negligence (Count I), strict liability due to ultrahazardous activities (Count II), gross negligence (Count III), private nuisance (Count IV), and trespass (Count V). *See id.* ¶¶ 113–54.  In support of these claims, Plaintiffs cite to the claimed events of the day and numerous federal regulations to argue that CSX caused the derailment and subsequent release of hazardous materials by, *inter alia*, failing to:

- Properly inspect and/or monitor wheel bearings. *See id.* ¶¶ 70–75, 79–80.  This includes CSX's alleged failure to install hot bearing detectors (HBDs) at sufficiently close intervals along the track, *see id.* ¶¶ 63–65,[2] or keep proper lookout during transit for possible signs of impending derailment from that risk. *See id.* ¶¶ 75–76, 119(e).

- Properly inspect and/or test railcars carrying hazardous materials for leakage, defects, or any other condition that could make them unsafe for transportation. *See id.* ¶¶ 66, 71–72.  This includes a failure to properly load the hazardous material and/or ensure it was in proper condition for transport. *See id.* ¶¶ 71–72.

- Properly hire, train, test, and/or supervise skilled engineers, conductors, and safety-related employees. *See id.* ¶¶ 70–71, 74.

- Adequately "develop and implement risk reduction programs (RRP), risk-based hazard management programs (HMP), and safety performance evaluation processes" that would have mitigated and/or prevented the derailment (and its subsequent damages) from occurring. *See id.* ¶ 77 (internal quotation marks omitted).

- Implement an adequate emergency plan and/or response in the aftermath of the derailment. *See id.* ¶¶ 78–80.

On March 7, 2024, CSX moved to dismiss Plaintiffs' Amended Complaint under theories of federal preemption and failure to state a claim. *See* DE 25; DE 25-1.  CSX's motion also attacks sub-components of the pleading (*e.g.*, as to damage allegations) and seeks to strike DE 19's class action allegations, primarily on numerosity and practicable joinder. *See id.*  Plaintiffs responded to DE 25 in full, *see* DE 31, and CSX replied. *See* DE 34.  The matter is fully briefed and ripe for review.

---

[1] The Court has yet to certify any proposed class action, and the parties have not moved for or completed any briefing on class certification.
[2] Specifically, Plaintiffs note that CSX's stated goal was to follow industry best practices by installing HBDs at intervals that averaged 15 miles in length. *See id.* ¶ 63.  However, the derailment occurred during a 23-mile interval, and the train had been traveling for 21 miles since it last passed an HBD. *See id.* ¶ 64–65.

## II.    LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  However, "a formulaic recitation of a cause of action's elements will not do." *Twombly*, 127 S. Ct. at 1964–65. Courts "must construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). Yet, courts need not accept "legal conclusion[s] couched as [] factual allegation[s]." *Papasan v. Allain*, 106 S. Ct. 2932, 2944 (1986). Hinging on Rule 8's minimal standards, *Twombly* and *Iqbal* require a plaintiff to "plead facts sufficient to show that her claim has substantive plausibility." *Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014). Where a plaintiff states "simply, concisely, and directly events that . . . entitle[] [her] to damages," the rules require "no more to stave off threshold dismissal for want of an adequate statement." *Id.*; *see El-Hallani v. Huntington Nat'l Bank*, 623 F. App'x 730, 739 (6th Cir. 2015) ("Although *Twombly* and *Iqbal* have raised the bar for pleading, it is still low.").

## III.    ANALYSIS

### A.  FEDERAL PREEMPTION

CSX first asserts that Plaintiffs' claims, which sound in state tort law in this diversity-based case, are preempted by federal law.  "Under the Supremacy Clause of the Constitution, federal law preempts conflicting state law." *CSX Transp., Inc. v. City of Sebree*, 924 F.3d 276, 282 (6th Cir. 2019) (quoting *Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 522 (6th Cir. 2001)); *see* U.S. CONST. art. VI, cl. 2.  Thus, "[w]here a state statute conflicts with, or frustrates, federal law, the former

must give way." *CSX Transp., Inc. v. Easterwood*, 113 S. Ct. 1732, 1737 (1993).  In any preemption analysis, "[t]he purpose of Congress is the ultimate touchstone." *Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008) (quoting *Medtronic, Inc. v. Lohr*, 116 S. Ct. 2240, 2250 (1996)).  If a federal statute contains an express preemption clause, "the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Easterwood*, 113 S. Ct. at 1737.

CSX argues that Plaintiffs' claims are preempted in full by operation of three independent federal statutes: the Interstate Commerce Commission Termination Act (ICCTA), 49 U.S.C. § 10101, *et seq.*, the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20101, *et seq.*, and the Hazardous Materials Transportation Act (HMTA), 49 U.S.C. § 5101, *et seq.  See* DE 25-1 at 13.  The parties dispute not only whether these statutes preempt Plaintiffs' claims, but also which statute's particular preemption analysis should apply to the claims at hand.

### 1.  Applicable Statute

Congress enacted the ICCTA in 1995, in part, in pursuit of government policy to "operate transportation facilities and equipment without detriment to the public health and safety."  49 U.S.C. § 10101(8).  The ICCTA provides the Surface Transportation Board (STB) with exclusive jurisdiction over "(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules[,] . . . practices, routes, services, and facilities of such carriers; and (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities[.]"  *Id.* § 10501(b).  The ICCTA's preemption provision states that "[e]xcept as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."  *Id.*

6

The FRSA serves "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101; *see Nickels v. Grand Trunk W. R.R.*, 560 F.3d 426, 429 (6th Cir. 2009). It empowers the Federal Railroad Administration (FRA), under the Secretary of Transportation, to "prescribe regulations and issue orders for every area of railroad safety[,]" and its express preemption provision states, in part, that "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a)(1); *see* 49 C.F.R. § 1.89(a).

The HMTA was enacted "to protect against the risks to life, property, and the environment that are inherent in the transportation of hazardous material." 49 U.S.C. § 5101. Pursuant to the HMTA, the Department of Transportation promulgates "regulations for the safe transportation, including security, of hazardous material in intrastate, interstate, and foreign commerce." *Id.* § 5103(b)(1); *see* 49 C.F.R. §§ 171–180.605. The HMTA generally preempts any state law that is "not substantively the same" as an HMTA regulation and relates to "the designing, manufacturing, fabricating, inspecting, marking, maintaining, reconditioning, repairing, or testing a package, container, or packaging component that is represented, marked, certified, or sold as qualified for use in transporting hazardous material in commerce." 49 U.S.C. § 5125(b)(1)(E).

Given the overlapping nature of these preemption provisions, the parties disagree as to which of the three statutes should or should not apply here: CSX argues that all three independently apply to and preempt DE 19's claims, while Plaintiffs contend that only the FRSA governs.

### i.    ICCTA vs. FRSA

The Sixth Circuit has previously held that the ICCTA "preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation."

*Adrian & Blissfield R.R. Co. v. Vill. of Blissfield*, 550 F.3d 533, 539–40 (6th Cir. 2008) (citation omitted). At the same time, Circuit precedent also posits "that if a regulation has a connection with rail safety then the 'FRSA provides the applicable standard for assessing federal preemption.'" *Sebree*, 924 F.3d at 285 (quoting *Tyrrell*, 248 F.3d at 524).

"Several circuits that have examined the interplay between [the] ICCTA and FRSA have concluded that the federal statutory scheme places principal federal regulatory authority for rail safety with the [FRA], not the STB. . . . Thus, FRSA provides the appropriate basis for analyzing whether a state law, regulation[,] or order affecting rail safety is pre-empted by federal law." *Island Park, LLC v. CSX Transp., Inc.*, 559 F.3d 96, 107 (2d Cir. 1999). While the Sixth Circuit has not expressly adopted this holding, *Sebree* strongly implied its applicability, and recent district court decisions have further followed *Island Park*'s analysis in the context of preemption and state common law claims. *See, e.g.*, *Smith v. CSX Transp., Inc.*, No. 3:13-cv-2649, 2014 WL 3732622, at *2 (N.D. Ohio July 25, 2014) ("Plaintiffs allege CSX negligently inspected and used defective track in violation of [FRA] regulations, resulting in [a] derailment and chemical spill. These allegations involve railroad safety procedures, which the FRSA—not the ICCTA—was enacted to regulate." (citations omitted)); *In re E. Palestine Train Derailment*, No. 4:23-cv-242, 2024 WL 1096064, at *7 (N.D. Ohio Mar. 13, 2024) (finding same). The STB itself agrees with this interpretation of its authority, stating in a recent agency adjudication that ICCTA preemption "applies only to non-safety railroad regulation" and that "Congress intended to retain the well settled safety authority of the FRA and the states under [the] FRSA when it enacted [the ICCTA]." *In re Waneck*, No. FD 36167, 2018 WL 5723286, at *5 n.6 (S.T.B. Oct. 31, 2018).

CSX argues that this view "misstates Sixth Circuit law" and cites to *Sebree*, *Tyrell*, *Trimbur v. Norfolk Southern Railway*,[3] and *Tipton v. CSX Transportation*[4] for the proposition that "courts in this Circuit . . . regularly analyze claims like Plaintiffs' under both the ICCTA's and FRSA's preemption doctrine." *See* DE 34 at 7–8. The Court rejects that characterization of these four cases. First, *Sebree* principally did not apply the FRSA because the claim at issue was a city ordinance, and "the FRSA's savings clause only applies to *state* regulations and cannot save any *municipal* regulations." 924 F.3d at 285 (citation omitted). As a result, the *Sebree* court did not even make a "finding as to whether the Ordinance is related to rail safety." *Id.*

In *Tipton*, the district court applied the ICCTA instead of the FRSA because the claims at issue did "not solely pertain to railroad safety procedures," and instead "relate[d] to the design and maintenance of the tracks and railroads themselves." 2016 WL 11501426, at *8. Here, Plaintiffs do not make any track design or track operation claims unrelated to rail safety. And while *Trimbur* does, at first glance, provide some tentative support for analyzing claims "related to track inspection and maintenance" under both the FRSA and ICCTA, the court there primarily focused its analysis on the former, invoking only a cursory reference to the ICCTA as an alternative means for preemption in the event the FRSA did not apply. *See* 2015 WL 4755205, at *8.

Finally, the STB itself has explicitly rejected CSX's interpretation of *Tyrell*. *See Waneck*, 2018 WL at 5723286, at *5 ("Despite the clear holding of *Tyrell*, CSX[] argues that the case actually stands for the proposition that rail safety-related claims should be examined under both the ICCTA and FRSA preemption provisions. No fair reading of *Tyrell* supports such an interpretation. The court in *Tyrell* found that because the regulation at issue had 'a connection with rail safety' . . . [the] FRSA provides the applicable standard for assessing federal preemption

---

[3] No. 2:13-cv-160, 2015 WL 4755205, at *5 (S.D. Ohio Aug. 10, 2015)
[4] Nos. 3:15-cv-311-TAV-CCS *et al.*, 2016 WL 11501426 (E.D. Tenn. July 7, 2016).

9

. . . .").[5]  *Island Park* undoubtedly read *Tyrell* counter to CSX, citing it as one of the cases supporting the proposition that "FRSA provides the appropriate basis for analyzing whether a state law, regulation or order affecting rail safety is pre-empted by federal law."  *Island Park*, 559 F.3d at 107 (citing *Tyrell*, 248 F.3d at 523).

Thus, the Court will analyze any claim relating to rail safety exclusively under the FRSA.

### ii.     FRSA vs. HMTA

The FRSA's preemption provision also applies to regulations prescribed by the HMTA, with courts holding that the latter inherently relates to rail safety when applied in the context of railroads.  *See CSX Transp., Inc. v. Pub. Utils. Comm'n of Ohio*, 901 F.2d 497, 501 (6th Cir. 1990) ("Clearly, the HMTA is a law relating to railroad safety, even if regulations pursuant to it are promulgated by the Secretary directly, not the FRA."); *see also Trimbur*, 2015 WL 4755205, at *5 ("Notably, the FRSA preemption analysis applies to the HMTA."); *Tipton*, 2016 WL 11501426, at *15 ("As the Sixth Circuit has held that the FRSA preemption analysis applies to the HMTA, and the FRSA preemption section contains a savings clause that expressly states that state law claims for personal injury or property damage for failure to comply with a federal regulation or standard are not preempted, the Court finds that it would be consistent with the Sixth Circuit's holding to find that a common law negligence action is not preempted under the HMTA either."); *E. Palestine*, 2024 WL 1096064, at *6 (finding same).  Accordingly, the Court here too finds that the FRSA's preemption analysis applies to HMTA regulations.

---

[5] CSX also cites to an amicus brief filed in support of a writ of certiorari from the Supreme Court in a recent derailment case.  *See* DE 34 at 8 (citing Brief for the United States as Amicus Curiae, *Ohio v. CSX Transp., Inc.*, No. 22-459, 2023 WL 8112708 (brief filed Nov. 21, 2023)).  Whatever tenuous persuasive authority this amicus brief might have had, however, was undermined by the Supreme Court's recent denial of cert in that case.  *See* 144 S. Ct. 545 (2024).

Thus, claims relating to rail safety are exclusively analyzed for preemption under the FRSA, not the ICCTA or HMTA. Here, Plaintiffs contend that all of their claims relate solely to rail safety and can thus only be tested for preemption under the FRSA. *See* DE 31 at 13–14. CSX itself does not dispute this notion, and in fact, implicitly endorses it by (1) acknowledging that the FRSA only governs claims related to rail safety, and then (2) proceeding to argue that every one of Plaintiffs' claims are independently preempted by the FRSA (thus necessitating a connection to rail safety). *See* DE 25-1 16; DE 34 at 10. Accordingly, the Court will analyze Plaintiffs' claims for preemption solely under the FRSA.

## 2. FRSA Preemption Analysis

The FRSA "preempts any state or local law, regulation, order that is 'an additional or more stringent law, regulation, or order related to railroad safety and security.'" *Smith*, 2014 WL 3732622, at *2 (citing 49 U.S.C. § 20106(a)(2)). States may continue to enforce laws and regulations that relate to railroad safety until the FRA adopts a regulation "covering" the same subject matter. *See Nickels*, 560 F.3d at 429 (finding that a "state-law negligence action is 'covered' and therefore preempted if a FRSA regulation 'substantially subsume[s]' the subject matter of the suit").

In 2007, Congress added a clarification regarding state law causes of action to the FRSA's preemption provision, which now states in part:

> Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party–
>
> > (A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;

(B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or

(C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

49 U.S.C. § 20106(b)(1).

The argument here really reduces to application of section (b) and the preemptive effect under the FRSA on a state law tort claim. Under the rubric, "[n]ormal State negligence standards apply where there is no Federal action covering the subject matter." 49 C.F.R. § 217.2. And, a state tort action may yet proceed, even when a federal regulation covers the subject matter, for "violation of the Federal standard of care established by regulation or order issued by the Secretary of Transportation (with respect to railroad safety . . . ) [or] a party's violation of, or failure to comply with, its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the two Secretaries[.]" *See id.*

### i.    Covered by Federal Regulation

The Supreme Court's decision in *Easterwood*, 113 S. Ct. 1732, guides analysis of whether a claim is covered by existing federal law. That case involved an accident where a truck driver was killed after being struck by a train at a railroad crossing. The driver's estate sued the railroad operator under Georgia common law, asserting that the operator was negligent in failing to install signals at the crossing and for operating the train at an excessive speed.

In considering whether the driver's claim was covered by regulation, the Supreme Court first explained that the railroad operator had to show more than just that federal regulations "touch upon" or "relate to" the same subject matter as the state negligence law. *Id.* at 1738 (citation omitted). Instead, the Court clarified that "'covering' is a more restrictive term which indicates that pre-emption will lie only if the federal regulations *substantially subsume* the subject matter of

the relevant state law." *Id.* (emphasis added).  With regard to the claim that the railroad was negligent in failing to install signals, the Court analyzed all relevant regulations, finding that some were inapplicable because they were merely advisory or concerned the allocation of federal funds, not railroad operations.  Others were arguably specific enough to preempt the state claim, but the Court found that the facts of the case did not fall within those regulations' requirements.  For example, one regulation required that automatic crossing gates be installed if federal funds were used for the installation of warning devices.  While this language would normally displace the negligence claim, the Court found that it did not apply because there was no evidence that federal funds were actually used on warning devices at the crossing in question.  *See id.* at 1740–42.  Thus, the estate's negligence claim relating to the lack of signals was not preempted by a covering regulation.

Here, CSX contends that all of Plaintiffs' claims are covered by federal regulations.  *See* DE 25-1 at 17–20.  Plaintiffs do not dispute this point for most of their allegations, which are largely based on specific violations of FRSA and HMTA regulations.  *See* DE 19 ¶¶ 70–80. However, Plaintiffs argue that federal law does not substantially subsume the specific claims that CSX (a) "failed to employ any effective method for monitoring of overheated wheel bearings"; (b) "failed to properly use hot bearing detectors"; (c) "fail[ed] to keep lookout during transport for dangers, such as overheated bearings"; and (d) "failed to follow any responsible emergency response plans that would minimize and contain the release of toxic chemicals into the environment."  *See* DE 31 at 16, 18 (citing corresponding sections of Amended Complaint).

CSX argues these first two claims, which both relate to overheated wheel bearings, are covered by 49 C.F.R. §§ 215.103(h) and 215.115(a)(1) (collectively prohibiting use of railcar in transit if a wheel presents certain indicators of being overheated, such as discoloration, damage to

the seal, or distortion of any bearing component), as well as § 215.11 (requiring rail operators to employ qualified inspectors to ensure compliance with all sections of Part 215). Taken together, these provisions impose upon rail operators a specifically defined regulatory duty to inspect for and identify overheated wheel bearings. Such a duty substantially subsumes the claim that CSX, as to pre-inspection or periodic inspection, "failed to employ any effective method for monitoring of overheated wheel bearings." *See Tipton*, 2016 WL 11501426, at *10–11 (finding §§ 215.103(h) and 215.115 covered plaintiffs' claim that CSX failed to "maintain devices capable of detecting overheated rail car wheel roller bearings during train operation" (alteration omitted)).

A general duty to implement and maintain some kind of effective method for wheel-bearing monitoring is distinguishable, however, from an alleged duty to properly employ a *specific* method for such monitoring (*e.g.*, HBDs). While the proper use of HBDs and the above CFR regulations both generally relate to the issue of overheated wheel bearings, "[t]o prevail on a claim that federal regulations are preemptive, a party must establish more than that they touch upon or relate to the state regulation's subject matter." *Tyrrell*, 248 F.3d at 524 (quoting *Easterwood*, 113 S. Ct. at 1738). In a recent safety advisory publication, the FRA expressly stated that "there are no Federal regulations requiring the use of HBDs for freight trains, or any regulations related to the inspection, calibration, and maintenance of this equipment[.]" *FSA Safety Advisory 2023-01*, 88 Fed. Reg. 13494, 13496 (Mar. 3, 2023). Thus, because there are no federal regulations covering the subject matter of mid-trip bearing monitoring via such device, Plaintiffs' claims concerning proper use of HBDs (once CSX made the decision to utilize them) are not preempted. *See E. Palestine*, 2024 WL 1096064, at *5 (finding same).

As to Plaintiffs' in-transit lookout claim, some courts have held that such allegations are not covered by federal law. *See id.* (collecting cases). As CSX points out, however, the Amended

Complaint alleges that "CSX had a common law duty to keep a lookout during transport for potential dangers and issues. *Its failure to do so further violated* 49 C.F.R. 215.115(a)(1)."  DE 19 ¶ 76 (emphasis added).  Thus, Plaintiffs themselves functionally concede that their lookout claim is covered by § 215.115(a)(1).

The same fate befalls Plaintiffs' contention that no federal regulation covers CSX's failure to "follow any responsible emergency response plans that would minimize and contain the release of toxic chemicals into the environment."  DE 31 at 18; *see* DE 119 ¶(i).  In DE 19, Plaintiffs expressly premise this claim on alleged violations of HMTA regulations.  *See* DE 19 ¶¶ 78–79.  Because the same FRSA preemption analysis applies to the HMTA, the Court finds once again that Plaintiffs willingly concede coverage of the claim by federal law.

Thus, the Court concludes that Plaintiffs' allegations relating to the proper use of HBDs are not covered by existing federal law and are therefore not preempted under the FRSA.  All other claims are covered, however, and require further analysis under § 20106(b).

## ii.    Violation of Covered Regulation

Plaintiffs' covered claims can still avoid preemption if they allege that CSX failed to comply with the covering federal regulation.  49 U.S.C. § 20106(b)(1)(A).

CSX argues that Plaintiffs do not plausibly allege any FRSA violations because they "simply recite a list of regulations, then declare without explanation that CSX[] breached them."  DE 25-1 at 20; *see* DE 34 at 12 ("[T]he Amended Complaint merely parrots FRA regulations; it does not allege a single thing about them, such as facts conceivably demonstrating their breach.").

This type of plausibility argument is misplaced in the context of a preemption analysis.  As articulated by the court in *East Palestine*:

> Norfolk Southern admits that "Plaintiffs allege that it violated 'one or more regulations,' listing a host of regulations that Norfolk Southern purportedly

15

violated," and that "Norfolk Southern violated duties imposed by federal regulations." Yet, Defendants attempt to sidestep this admission by arguing they did not violate any regulations. But such a factual inquiry is not appropriate for a motion to dismiss. Plaintiffs' allegations put Defendants on notice of duties they may have violated, which is sufficient to overcome a preemption argument on a motion to dismiss. To that end, the Court believes that the efficient and appropriate way forward is to permit discovery to occur and consider the parties' arguments on summary judgment. *See, e.g.*, *Smith v. CSX Transp., Inc.*, No. 3:13 CV 2649, 2014 WL 3732622, at *3 (N.D. Ohio July 25, 2014) (court denied motion to dismiss based on FRSA preemption arguments because "the FRA has prescribed regulations regarding the inspection of rails, [and] Plaintiffs allege [the defendant] failed to comply with those regulations."); *Diehl*, 349 F. Supp. 3d at 503 (court denied motion to dismiss based on FRSA preemption arguments because it would be incorrect to do so "at this [motion to dismiss] stage" because "Plaintiff alleges that Defendant failed to comply with these regulations").

Similarly, the Court will deny Norfolk Southern's motion to dismiss Plaintiffs' allegations under the FRSA, which are premised on express violations of FRSA regulations. These allegations include that Defendants breached duties owed to Plaintiffs by violating 49 C.F.R. § 215.115, which prohibits placing in service or continuing in service a train car with an overheated roller bearing, as well as allegations that Norfolk Southern violated regulations relating to inspections, training, and the transportation of hazardous materials.

2024 WL 1096064, at *6 (footnote and internal citations omitted) (alterations cleaned up).

Here, Plaintiffs list  and provide citations to specific FRA and HMTA regulations allegedly violated by CSX.  *See* DE 19 ¶¶ 70–80.  This is adequate to put CSX on clear notice of the duties they may have breached, and suffices for "alleging that a party – has failed to comply with the Federal standard of care established by a regulation issued . . . with respect to railroad safety matters[.]"  49 U.S.C. § 20106(b)(1)(A).

Thus, the Court concludes that, at this stage, CSX fails to show federal preemption of Plaintiffs' claims, which invoke and hinge on federal standards or non-preempted state theories. Certainly, there is little specific linkage between the alleged events and each regulation cited. However, the Amended Complaint factually contends the cause of the derailment, the regulatory duties regarding railcar defects, and the flawed (and violative) response by CSX to the event.

Whether each and every regulation applies, and how state duties fill any gaps, will be tested via discovery and later litigation. The Court finds that the FRSA does not "preempt [the] action under State law seeking damages for personal injury . . . or property damage[.]" *See id.*

### B. COGNIZABLE INJURY

CSX next argues that the Amended Complaint fails to plausibly support any legally cognizable injuries. *See* DE 25-1 at 23–26. Plaintiffs allege (and CSX challenges) injuries to both their person and their property. The Court addresses each in turn.

#### 1. Personal Injury

Plaintiffs claim that as a direct result of their exposure to $SO_2$, they suffered from the following physical symptoms: "irritation to their throats, eyes, lungs, mouths, and lips"; "difficulty breathing"; "throat and nose burns"; "skin irritation"; "coughing"; "lung conditions"; "headaches[] and a respiratory infection"; an "irritated nose[] and postnasal drip"; "a lingering cough, distinct lack of energy, sore throat, and headaches"; "breathing complications"; and "shortness of breath, chest tightness, sore throats, mucus membrane burns, and headaches." DE 31 at 11; *see* DE 19 ¶¶ 20, 38, 47–48, 82, 87, 93, 120. Plaintiffs further allege that going forward, they "will need to undergo periodic diagnostic medical examinations as a result of [their $SO_2$ exposure]" and will be forced to "live[] with ongoing fear for the long-term consequences to [their] health" due to risks associated with $SO_2$ exposure. *See* DE 19 ¶¶ 84, 87, 93, 98; *see also id.* ¶¶ 56–57 (discussing future symptoms that may develop due to $SO_2$ exposure).

CSX argues that all of these alleged physical ailments—which CSX archly describes as common "cold-like symptoms," DE 25-1 at 25—can be "caused by many things in life and [are] not tied plausibly—or at all—to the chemical in question." *See id.* at 24; *see also* DE 34 at 14 (contending that Plaintiffs "do not allege a single fact stating that any Plaintiff has *actually* been

diagnosed with conditions medically associated with sulfur dioxide exposure"). CSX further argues that absent these physical ailments, Plaintiffs' remaining allegations about future risk and the need for continued medical monitoring amount to mere "speculation about what may happen, not what has happened or might medically be expected to happen from a derailment." *See* DE 25-1 at 24 ("[W]hen Plaintiffs demand 'periodic diagnostic medical examinations' of unstated duration, with unstated treatments, for unstated conditions or symptoms, they state a form of relief not recognized in Kentucky." (citations omitted)).

The Court rejects CSX's arguments at the pleading stage. In the Amended Complaint, Plaintiffs: allege that the derailment caused significant amounts of sulfates and (then) $SO_2$ to be released into the surrounding air, water, and soil; describe the ways they were exposed to $SO_2$, *see* DE 19 ¶¶ 81–93; discuss in detail the common symptoms of $SO_2$ exposure, *see id.* ¶¶ 51–57; and provide extensive descriptions of their subsequent physical harms, which align with the alleged symptoms of $SO_2$. *See id.* ¶¶ 84, 87, 93, 98. At this stage, the Court must accept these factual allegations as true, construe the Amended Complaint favorably, and draw all reasonable inferences in Plaintiffs' favor. *See Mills v. Barnard*, 869 F.3d 473, 479 (6th Cir. 2017). In doing so, the Court concludes that, far from being "too speculatively stated" as CSX contends, these facts are more than sufficient under Rule 8 to connect Plaintiffs' alleged physical harms to $SO_2$ exposure, caused by CSX. Such a finding is supported by similar derailment cases in this Circuit:

> The Amended Complaint alleges that CSX was negligent by failing to perform full or proper track inspections in violation of FRA regulations resulting in the derailment and chemical spill. The Amended Complaint also identifies injuries suffered by Plaintiffs (listing resident evacuation, payment of monetary expenses for "professional cleanup/remediation of their homes," physical discomforts including "eye and throat irritation, headaches, fatigue, nausea, throwing up . . . [exposure to] noxious gases, disagreeable odors and emotional distress" as injuries suffered by the named Plaintiffs, as well as the class). As required under Federal Civil Rule 8, the Amended Complaint provides CSX sufficient notice of the injuries claimed by Plaintiffs.

*Smith*, 2014 WL 3732622, at *4 (internal citations omitted)).  Seeing no basis for a different conclusion, the Court finds that Plaintiffs' alleged physical symptoms constitute legally cognizable injuries.  Plaintiffs hardly claim mere "exposure."  They claim exposure resulting in identifiable and specific injuries, and that suffices under Kentucky law.  *See, e.g.*, *Cap. Holding Corp. v. Bailey*, 873 S.W.2d 187, 192 (Ky. 1994) (confirming that a negligence cause of action accrues when a "potentially harmful exposure . . . causes injury that produces loss or damage").  Indeed, being enshrouded in a toxic cloud and claiming physical consequences directly caused by that exposure is the essence of a proper injury assertion.   Plaintiffs do not need to prove a case in the pleadings.

As to potential future harms and the need for medical monitoring going forward, Kentucky courts have "always allowed recognition of future medical damages as a remedy in an action for injuries resulting from negligence."  *Wood v. Wyeth-Ayerst Lab'ys*, 82 S.W.3d 849, 856 (Ky. 2002) (further stating that "[w]here there has been a physical injury requiring future medical treatment, medical monitoring damages may be a novel way of describing a remedy already employed in this jurisdiction"); *see Mod. Holdings, LLC v. Corning, Inc.*, No. 5:13-cv-405-GFVT, 2015 WL 1481457, at *16 (E.D. Ky. Mar. 31, 2015) (citing *Wood*, 82 S.W.3d at 857) ("Kentucky allows recovery of future medical monitoring costs as a potential form of remedy for plaintiffs with physical injury in an underlying cause of action[.]").   Here, CSX bases its future symptoms/medical monitoring arguments entirely on the assumption that Plaintiffs cannot show present physical injuries.  *See* DE 25-1 at 24; DE 34 at 13–14.  Given that the Court finds the injury allegations proper, Kentucky law is clear that potential future medical expenses constitute a legally cognizable injury.  Plaintiffs have therefore adequately alleged personal injuries.

### 2. Property Injury

CSX also disputes Plaintiffs' claim that CSX polluted "their properties with toxic sulfur dioxide in the air and sulfates in the soil and water sources." DE 31 at 24 (citing DE 19 ¶¶ 1–5, 8–10, 19–20, 49, 60, 143–45, 149, 153). The Amended Complaint alleges that $SO_2$ smoke enveloped Plaintiffs' properties at such high concentrations that it created white-out conditions and made it so that Plaintiffs could not escape the toxic gas "even while inside their homes." *Id.* ¶ 143. Plaintiffs further allege that in the time since the derailment, contaminating sulfates have remained present in their water sources and soil at "significant levels," which "suggest[s] an extremely high concentration of sulfur dioxide was present in the air after the derailment." *See id.* ¶ 49; DE 31 at 24. Plaintiffs also contend that these water and soil sulfates are the product of CSX's post-crash decisions and management. *See* DE 19 ¶¶ 141–57.

CSX argues that "[c]ontamination of soil or water—even when present on an individual's property—does not in itself create an injury under any of Plaintiffs' asserted theories," and further contends that "Plaintiffs do not allege that sulfates are harmful, let alone how (if at all) they have interfered with the use or enjoyment of their property." DE 25-1 at 25.

Construing DE 19 in the light most favorable to Plaintiffs, the Court finds that they have pleaded sufficient facts to state a claim for property damage under Rule 8. Injury to real property is established where an interference prevents a property owner from using and enjoying their land. *See Smith v. Carbide & Chems. Corp.*, 226 S.W.3d 52, 56–57 (Ky. 2007). Certainly, a blanket of toxic, blinding smoke would plausibly interfere with most uses of one's property. Plaintiffs here specifically allege displacement from their property as a result of the derailment. Likewise, while Plaintiffs do not go into detail about the specific effects of sulfates in their soil and waterways, they allege the chemical is present "at significant levels." DE 19 ¶ 145. High enough

concentrations of sulfates can contaminate both water and soil. *See Star Run, Inc. v. Ky. Env't & Pub. Prot. Cabinet*, 350 S.W.3d 1 (Ky. Ct. App. 2010) (case involving contamination of drinking water due to high levels of sulfates); *Butki v. U.S. Auto. Ass'n*, 274 Cal. Rptr. 909 (Cal. Ct. App. 1990) (sulfates in soil caused structural concrete damage to property owner's home). This creates a plausible inference that the sulfates here have contaminated (and thereby interfered with the use of) Plaintiffs' property—an actual injury. *See Smith*, 226 S.W.3d at 57. Plaintiffs also allege diminution in value, something a state of contamination would plausibly include. Thus, Plaintiffs sufficiently allege cognizable property damages.

### C. FAILURE TO STATE CLAIM

CSX next argues that as to all five of Plaintiffs' causes of action—negligence, gross negligence, ultrahazardous strict liability, private nuisance, and trespass—the Amended Complaint fails to state a claim. The Court addresses each below.

#### 1. Negligence

##### i.   Duty, Breach, Causation, and Damages

To prevail on a negligence claim under Kentucky law, a plaintiff must show "(1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty of care; (3) a causal connection between the defendant's conduct and the plaintiff[']s damages; and (4) damages." *Gonzalez v. Johnson*, 581 S.W.3d 529, 532 (Ky. 2019) (citing *Patton v. Bickford*, 529 S.W.3d 717, 729 (Ky. 2016)). Duty normally is a question of law for the court, while breach and injury present questions of fact left to the jury. *See Patton*, 529 S.W.3d at 729 (citing *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003)). Causation operates as "a mixed question of fact and law." *Id.*

Plaintiffs allege that CSX owed duties "to operate their railway enterprise in a manner which would not cause Plaintiffs . . . injury or harm," DE 19 ¶ 114; "to use reasonable care in the transportation of potentially hazardous materials," *id.* ¶ 115; to use "reasonable care [in] preventing unreasonable harm commensurate with the risk of operating a railroad," *id.* ¶ 117; and "to investigate the extent to which sulfur dioxide released from the train derailment was likely contaminating the air at levels to materially increase nearby residents' . . . likelihood and risks developing health conditions." *Id.* ¶ 118. CSX argues that these amount to "a series of theorized duties that do not exist" under Kentucky law. *See* DE 25-1 at 18–19. In response, Plaintiffs maintain that DE 19's alleged duties are simply expressions of Kentucky common law's universal duty of care (though informed by federal or industry standards), under which "every person owes [a duty] to every other person to exercise ordinary care in his activities to prevent a foreseeable injury." DE 31 at 27 (quoting *Mitchell v. Dow Chem.*, No. 6:11-cv-117-ART, 2011 WL 2938156, at *1 (E.D. Ky. July 19, 2011)). CSX posits in reply that this duty is not "boundless," and that imposition of such a duty on CSX here would amount to an improper attempt by the Court to "create new common law." *See* DE 34 at 15.

CSX is partially correct in that "[w]hat Kentucky courts have recognized through the 'universal duty of care' rule is that the existence of a duty of care is circumstantially limited: the duty is to exercise ordinary care to prevent foreseeable harm." *James v. Meow Media, Inc.*, 300 F.3d 683, 690 (6th Cir. 2002). "Thus, Kentucky courts have held that the determination of whether a duty of care exists is whether the harm to the plaintiff resulting from the defendant's negligence was 'foreseeable.'" *Id.* Here, the Court perceives CSX, in its rail operations implicating safety, as under a duty to act with ordinary care in preventing foreseeable harm. The question is simply whether CSX exercised "the same degree of care as a prudent [entity] engaged in a similar or like

22

business would exercise under the circumstances." *T & M Jewelry, Inc. v. Hicks*, 189 S.W.3d 526, 530 (Ky. 2006). Further, the specific federal regulations help inform the duty of care applicable under Kentucky law. *See id.* at 532 (not applying federal standard under KRS § 446.070 action but "borrowing it as the proper standard in cases brought under our common law"). Plaintiffs adequately allege ways in which this duty applies here, and further allege breach of this duty by arguing that CSX violated numerous federal provisions by, *inter alia*,

   a. Emitting dangerous volumes of sulfur dioxide and other harmful chemicals into the environment;
   b. Failing to employ safe methods to adequately control its railway enterprises and ensure that derailments did not occur;
   c. Failing to ensure the adequacy and operation of hot bearing detectors in accordance with industry standards;
   d. Failing to ensure the adequacy and operation of hot bearing detectors as necessary to detect overheated bearings in time to prevent and mitigate derailment;
   e. Failing to keep lookout during transport for dangers, such as overheated bearings;
   f. Failing to ensure equipment such as wheel bearing and axels were in good working condition;
   g. Failing to utilize corporate policies and procedures that would prevent derailments from occurring;
   h. Failing to route railcars carrying hazardous materials in such a way as to avoid populated areas and properly considering alternative routes that posted lower safety risks in violation of 49 C.F.R. § 172.820; and
   i. Failing to have, implement, or follow any responsible emergency response plans that would minimize and contain the release of toxic chemicals into the environment.

DE 19 ¶ 119.

   CSX contends that these breach allegations are conclusory and inadequately supported. *See* DE 25-1 at 27; *see* DE 34 at 15 ("Plaintiffs have not alleged *how* CSX[] violated any [duty.]"). The Court disagrees. Plaintiffs, in addition to alleging with precision the cause and results of the derailment, cite numerous FRSA and HMTA regulations and, for each one, contend that CSX allegedly failed to act in accordance with the regulation. Plaintiffs also provide specific facts about

CSX's use of HBDs, their conduct in the wake of derailment, and their subsequent storage or dumping with resultant off-gassing. This provides CSX with adequate information and "fair notice concerning the nature of the claim and the grounds upon which it rests." *Twombly,* 127 S. Ct. at 1965; *see Stinnett v. CSX Transp., Inc.*, No. 3:08-cv-86-TBR, 2008 WL 4443096, at *1–2 (W.D. Ky. Sept. 26, 2008) ("The Court finds that Plaintiff has alleged sufficient facts for her entitlement to relief to be plausible on its face. Plaintiff alleges that Defendant's negligence and gross negligence caused a train derailment which spilled toxic chemicals that injured Plaintiff. This is not the sort of speculative pleading forbidden by *Twombly*.").

Plaintiffs also properly plead causation and damages. As detailed above, the Amended Complaint describes and catalogues the numerous resultant personal injuries Plaintiffs suffered, which include immediately present and lingering physical ailments as well as increased risk of serious and potentially fatal illnesses going forward. *See supra* Section III.B.1. Plaintiffs further explain how these injuries were the result of CSX's negligent derailment and subsequent release of sulfates and $SO_2$. *See id.* This is more than enough for the Court to draw a plausible connection between CSX's alleged conduct and Plaintiffs' harms.

These findings comport with how other district courts have treated Rule 12(b)(6) motions in similar toxic-exposure derailment cases:

> In the complaints, plaintiffs detail how both defendants allegedly owed a duty to inspect, maintain, and repair its rail cars and wheel roller bearings, to identify the toxic chemical involved in the derailment, and to control the toxic chemical release, among other things. Some—but not all—of these duties arise from the FRSA and the HMTA. Plaintiffs then allege how defendants breached these duties, and how such breaches were both a proximate cause and cause in fact of plaintiffs' damages. The Court is able to "draw the reasonable inference" that each defendant's negligence was a proximate cause of the train derailment and subsequent chemical spill and fire, which caused plaintiffs property and personal injury damage. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). Accordingly, the Court finds that plaintiffs have stated a claim for negligence.

24

*Tipton*, 2016 WL 11501426, at *18 (internal citations and footnote omitted); *see also E. Palestine*, 2024 WL 1096064, at *8; *Stinnet*, 2008 WL 4443096, at *1–2.  Accordingly, the Court finds that Plaintiffs have plausibly alleged facts to support the elements of a negligence claim.  Plaintiffs specify duties pertinent to pre-transport (inspection, car integrity), intra-transport (inspection, monitoring, recognition of failure), and post-derailment (response, communication accuracy, management of incident) accompanied by purported breach and associated harms.  The Amended Complaint survives Rule 12(b)(6) scrutiny.

### ii.    Firefighter's Rule

Finally, CSX argues, in an early merits attack, that Plaintiff Webb specifically cannot recover for negligence under Kentucky's Firefighter's Rule.  The principle holds that

> for reasons of public policy, . . . firemen [and other public first responders such as police officers and paramedics] are required to assume the ordinary risks of their employment, a dangerous occupation, to the extent necessary to serve the public purpose of fire control, and this means providing the Fireman's Rule as a defense for those who are the owners or occupiers of the property he is employed to protect.

*Norfolk S. Ry. Co. v. Johnson*, 554 S.W.3d 315, 317 (Ky. 2018) (quoting *Hawkins v. Sunmark Indus., Inc.*, 727 S.W.2d 397, 400 (Ky. 1986)).  For the rule to apply, three prongs must be satisfied:

> 1) The purpose of the policy is to encourage owners and occupiers, and others similarly situated, in a situation where it is important to themselves and to the general public to call a public protection agency, and to do so free from any concern that by so doing they may encounter legal liability based on their negligence in creating the risk[;]
>
> 2) The policy bars public employees (firefighters, police officers, and the like) who, as an incident of their occupation, come to a given location to engage a specific risk; and
>
> 3) The policy extends only to that risk.

*Id.* (citing *Sallee v. GTE S., Inc.*, 839 S.W.2d 277, 279 (Ky. 1992)).  Thus, the rule only applies if the public employee was "injured by a risk inherent in his occupation."  *Id.  Hawkins* provides a seminal example of such risk:

> In *Hawkins v. Sunmark Indus., Inc.*, 727 S.W.2d 397 (Ky. 1986), firefighters were called upon to attend a fire at a gas station where a motorist had backed into a gasoline pump and initiated the fire. A gas explosion occurred shortly after their arrival, allegedly caused by negligence in the design of the pump. We held that the owner and the occupier of the premises were protected by the Firefighter's Rule, and the motorist as well, because they fit the class of persons who should be encouraged to call the fire department when the fire occurred, rather than restrained from doing so by concern over personal liability to the firefighters who would respond.

*Sallee*, 839 S.W.2d at 280 (citation reformatted).  Conversely, the rule did not bar, for example, recovery for a paramedic who fell into a shallow trench while responding to a call, as this was not "a risk inherent in his occupation."  *See Johnson*, 554 S.W.3d at 317 (summarizing *Sallee*, 839 S.W.2d 277).

CSX argues in the present motion that Webb's alleged injuries were an inherent and incidental risk of her role as a first-responding firefighter, and that she cannot otherwise "plausibly show[] that her alleged injuries were not incurred during the time she spent working at the site of the fire." DE 25-1 at 28.  Plaintiffs retort that Webb's prolonged exposure to toxic $SO_2$ went beyond the scope of those risks inherent to her role as a firefighter and first responder.

Accepting Plaintiffs' allegations as true, the Firefighter's Rule does not bar, at least not fully, Webb's recovery.  The Amended Complaint claims that CSX failed to warn Webb—who spent "many hours" at the derailment site, *see* DE 19 ¶ 81—about the risk of potential exposure to hazardous materials such as $SO_2$.  Instead, CSX assured first responders "that there was no cause for concern, as the railcars were carrying substances that were 'food grade.'" *Id.* ¶ 37.  The Amended Complaint also alleges unreasonable delay in air quality testing.  *See id.* ¶ 58.  On the current record, unknown and prolonged exposure to toxic $SO_2$ gas is not an ordinary risk inherent to the occupation of a firefighter, especially when the entity responsible for the release of said gas

expressly and incorrectly informed the firefighter that there was no risk of exposure to any dangerous chemicals.

In *Tipton*—a case that also dealt with a toxic-release derailment—the district court came to the same conclusion after analyzing a substantively similar version of the Firefighter's Rule under Tennessee law:

> In assessing whether this rule precludes a police officer or fireman's claims, "the salient question is whether the danger encountered by the employee is a danger that can be reasonably expected given the nature of the position of employment." *Jamison v. Ulrich*, 206 S.W.3d 419, 424 (Tenn. Ct. App. 2006). . . .
>
> In taking the [] plaintiffs' allegations as true, the Court finds that the Tennessee policemen and firemen's rule does not bar plaintiffs' claims. In their amended complaint, the [] plaintiffs state that they spent several hours in the area near the train derailment before being informed of the identity of the toxic chemical that was being released. They submit that being exposed to "unknown toxic chemicals in smoke, vapors, and fumes from a train derailment and fire is not the type of risk peculiar to plaintiffs' employment as law enforcement officers, nor is it the type of risk plaintiffs were hired, trained, or equipped to confront." Accordingly, the Court finds that the [] plaintiffs have sufficiently alleged that being exposed to toxic chemicals is not a reasonably expected danger, given the nature of the police officers' position of employment. As a result, the policemen and firemen's rule will not operate to preclude their claims against CSX and UTC.

2016 WL 11501426, at *3 (internal citations omitted).  Accordingly, the Court finds that Webb's exposure to toxic $SO_2$ gas was not an ordinary risk inherent to her job as a firefighter, and her negligence claims are therefore not precluded by the Firefighter's Rule.  Further, of course, Webb suffered exposure as a resident (¶ 81) and community member, separate and apart from her employment response.  At this stage, the Court could not extricate one exposure from the other, even if and to the extent the limiting principle might influence Webb's recovery.

## 2. Gross Negligence

Gross negligence carries the same elements as a regular negligence claim, with the added requirement that defendant's negligence be accompanied by "wanton or reckless disregard for the

lives, safety, or property of others." *Gibson v. Fuel Transp., Inc.*, 410 S.W.3d 56, 59 (Ky. 2013) (quoting *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 389–90 (Ky. 1985)). Gross negligence can be established by "the absence of slight care." *Brotherton v. Victory Sports, Inc.*, 24 F. Supp. 3d 617, 620 (E.D. Ky. 2014) (quoting *Donegan v. Beech Bend Raceway Park, Inc.*, 894 F.2d 205, 207 (6th Cir. 1990)); *see Williams v. Wilson*, 972 S.W.2d 260, 263 (Ky. 1998) (recognizing, as a contemporaneous precedent to adoption of Kentucky's Constitution: "The absence of slight care in the management of a railroad train is gross negligence." (citation omitted)). In this sense, gross negligence, "however it may be qualified, is conduct lacking intent or actual knowledge of the result." *Williams*, 972 S.W.2d at 264. "Even where a single act of negligence might not constitute gross negligence, gross negligence may result from several acts." *Horton*, 690 S.W.2d at 388 (citation omitted).

CSX argues that Plaintiffs plead no facts "that might even conceivably support so serious a contention" as gross negligence, labeling Plaintiffs' claims in this regard as "disparagement by innuendo." *See* DE 25-1 at 31–32. The Court views the Amended Complaint as providing, at the pleading stage, sufficient factual support for Plaintiffs' gross negligence claims. Plaintiffs expressly allege that CSX failed to monitor, inspect, and maintain cars carrying potentially hazardous chemicals, causing the injurious derailment. Further, they allege that CSX released molten sulfur into the surrounding area during and (with staging in the community) in the months after the derailment and allowed breached cars containing molten sulfur to remain continuously exposed to the elements for an additional period. *See* DE 19 ¶¶ 126–27. Plaintiffs also claim that CSX gave inaccurate advice and incomplete information regarding the substances and risks involved. *See id.* ¶ 37. That allegedly occurred at the time the plume had developed in the community. Taken together and crediting the claimed facts, and given the specifics alleged

regarding the properties and hazards of the transported substances, the record plausibly supports an inference of the absence of slight care on CSX's part, relative to the incident and its aftermath. *See E. Palestine*, 2024 WL 1096064, at *9 (finding plaintiffs sufficiently alleged gross negligence where it was defined as "wanton or reckless conduct" under Ohio law); *Stinnett*, 2008 WL 4443096, at *1–2 (upholding gross negligence claim in factually similar derailment-exposure case).

Thus, adopting all reasonable inferences in Plaintiffs' favor, DE 19 plausibly alleges that CSX showed a wanton or reckless indifference to the obvious risks their conduct posed, and acted without even slight care for the foreseeable harms from their conduct. Plaintiffs' gross negligence claims may therefore proceed.

### 3.  Ultrahazardous Activity (Strict Liability)

Plaintiffs allege that CSX engaged in ultrahazardous activities (and is therefore strictly liable) by transporting toxic and combustible chemicals, allowing breached cars to remain in the area for two months, and dumping sulfur throughout the community. *See* DE 19 ¶¶ 123–32.

An activity is considered ultrahazardous if "the very operation itself is, and is known and recognized to be, inherently dangerous at its inception." *Randall v. Shelton*, 293 S.W.2d 559, 561 (Ky. 1956). This standard "does not require that all risk be eliminated by the exercise of due care." *Mod. Holdings*, 2015 WL 1481457, at *9. Instead, "the risk must be reducible by care to the point where the likelihood of harm is no longer high." *Id.* (quoting *Arlington Forest Assocs. v. Exxon Corp.*, 774 F. Supp. 387, 390 (E.D. Va. 1991)).

Kentucky law follows the Restatement (Second) of Torts § 521, in that it does not recognize a strict liability cause of action for ultrahazardous activities "performed pursuant to a public service or public necessity." *Johnson v. CSX Transp., Inc.*, No. 3:08-cv-99-TBR, 2008 WL

4427211, at *2 (W.D. Ky. Sept. 25, 2008) (citing *Ky. Utils. Co. v. Auto Crane Co.*, 674 S.W.2d 15 (Ky. Ct. App. 1983)). Included within this common carrier exception are those who participate in the "transportation of flammable or dangerous chemicals." *Mod. Holdings*, 2015 WL 1481457, at *7 & n.12 (collecting cases). As a result, Kentucky exempts railroads from strict liability for harms resulting from the transportation of hazardous materials. *See Johnson*, 2008 WL 4427211, at *2.

Applied here, CSX may not be strictly liable for damages that stem directly from its legal obligation to transport hazardous materials, *i.e.*, the initial breach and $SO_2$ leak. However, the common carrier exemption does not extend to conduct outside the course of the legally imposed duty. *See Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1006 (9th Cir. 2008) (noting that most courts that have adopted the public policy duty in § 521 "have generally done so only to the extent a defendant was legally required to perform the ultrahazardous activity"). Thus, while CSX was legally obligated to transport hazardous material as a common carrier, there was no such obligation as it pertains to their post-derailment material handling and breached-car staging. The Court must therefore analyze that conduct using Kentucky's normal ultrahazardous activities analysis.

Kentucky has traditionally applied strict liability for ultrahazardous activities narrowly, largely limiting the doctrine to blasting. *See, e.g.*, *Stathers v. Garrard Cnty. Bd. of Educ.*, 405 S.W.3d 473, 479 (Ky. Ct. App. 2012); *Island Creek Coal Co. v. Rodgers*, 644 S.W.2d 339, 348 (Ky. Ct. App. 1982); *Wolf Creek Collieries Co. v. Davis*, 441 S.W.2d 401, 403 (Ky. 1969). A related line of water-rights cases holds landowners strictly liable when their upstream activities cause flooding that damages lower riparian landowners' properties. *See Inland Steel Co. v. Isaacs*, 143 S.W.2d 503, 505 (Ky. 1940); *Beaver Dam Coal Co. v. Daniel*, 13 S.W.2d 254, 255 (Ky. 1929).

In *Modern Holdings*, the court analyzed whether a manufacturing plant's use and intentional disposal of a toxic by-product in the surrounding area constituted an abnormally

dangerous activity. *See* 2015 WL 1481457, at *9. The court found that it did not, noting that "other jurisdictions have held that the risks associated with disposal of toxic chemicals can be avoided through the exercise of due care." *Id.* (collecting cases). The court further emphasized that "ultrahazardousness or abnormal dangerousness is, in the contemplation of the law at least, a property not of substances, but of activities." *Id.* at *10 (quoting *Ind. Harbor Belt R.R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1181 (7th Cir. 1990)). Thus, while the hazardous materials at issue were undoubtedly dangerous, it was defendants' "disposal activity that is the proper focus of the Court's analysis." *Id.* Within this framing, the court found that defendants' dumping was not an activity "inherently dangerous at [its] inception" given that state and federal environmental laws regarding toxic disposal "are premised on the notion that proper handling and disposal of these hazardous substances can minimize the risks associated with their use." *Id.*

The Court finds this logic applicable and persuasive in the case at hand. While molten sulfur and $SO_2$ might certainly be dangerous *materials*, Plaintiffs have not plausibly shown that the *activity* of properly disposing and storing them is itself so inherently dangerous that the risk of harm cannot be reduced to a reasonable degree through exercise of due care. The Court thus declines to extend Kentucky's ultrahazardous strict liability doctrine to a railroad's post-derailment storage and disposal of hazardous materials and accordingly grants CSX's motion as to this count.

### 4. Private Nuisance

A nuisance is a class of wrong that "arises from the unreasonable, unwarrantable, or unlawful use by a person of his own property and produces such material annoyance, inconvenience, discomfort, or hurt that the law will presume a consequent damage." *Smith v. Carbide & Chemicals Corp.*, 507 F.3d 372, 379 (6th Cir. 2007) (quoting *City of Somerset v. Sears*, 233 S.W.2d 530, 532 (Ky. 1950)). Kentucky recognizes two types of nuisances: private and

public.  *See W.G. Duncan Coal Co. v. Jones*, 254 S.W.2d 720, 723 (Ky. 1953).  A private nuisance affects an individual or a limited number of individuals, while a public nuisance affects the public at large.  *Id.*  Kentucky codified the definition of private nuisance as existing "if and only if a defendant's use of property causes unreasonable and substantial annoyance to the occupants of the claimant's property or unreasonably interferes with the use and enjoyment of such property, and thereby causes the fair market value of the claimant's property to be materially reduced."  KRS §§ 411.530(2), 411.540(2). Diminution in value of the property is the only proper measure of private nuisance damages.  *See id.* § 411.560.

Plaintiffs allege they suffered private nuisance due to the $SO_2$ smoke in the air and the "significant levels" of sulfates in Plaintiffs' soil and water.  *See*  DE 19 ¶¶ 144–45.

If an invading pollutant "create[s] an unpleasant odor or sound, or [is] otherwise offensive to human senses, such sensory offensiveness [can] generate the annoyance and interference necessary for a nuisance."  *Rockwell Int'l Corp. v. Wilhite*, 143 S.W.3d 604, 627 n.106 (Ky. Ct. App. 2003).  Here, Plaintiffs provide detailed descriptions of the potential health hazards of $SO_2$ exposure, *see* DE 19 ¶¶ 51–57, and further allege that this toxic smoke created white-out conditions and engulfed their properties to such a degree that Plaintiffs could not escape it "even while inside their homes."  *Id.* ¶ 143.  This constitutes, at minimum, an extremely unpleasant offense to the human senses that generates a sufficient level of annoyance and interference to establish, or contribute to a claim for, nuisance.  Plaintiffs allege lingering contamination and diminution in property value—these are hallmarks of nuisance.

This does not end the analysis, however, as CSX focuses the brunt of its nuisance argument on the character of the sulfates allegedly present in Plaintiffs' soil and water.  CSX argues that,

32

unlike the SO$_2$ smoke, these non-gaseous sulfates are imperceptible to the human senses and pose no barrier to Plaintiffs' use and enjoyment of their property.  *See* DE 25-1 at 32–33.

If an invading pollutant is imperceptible, an "irrational fear" of said pollutant is insufficient to support a private nuisance claim, and a plaintiff must instead show that it poses a demonstrable health or safety risk:

> While it is true that the presence of PCBs [a type of imperceptible chemical] on land may cause a reasonable person to stop using that land because of health risks PCBs pose, it is only the case when a significantly higher concentration of PCBs is present. At the concentrations present on the lands in question, a person of ordinary health and sensitivities would experience no interference with his or her use of the property. There is no scientific basis for concluding that these lands should not be used for their ordinary agrarian purposes. Any annoyance or interference sustained by the landowners here is the result of an irrational fear of PCBs. The law does not allow relief on the basis of an unsubstantiated phobia.

*Wilhite*, 143 S.W.3d at 627; *cf. Smith*, 507 F.3d at 379 (concluding plaintiffs suffered a "tangible and substantial" interference with their property when, due to defendant's pollutants, plaintiffs were "no longer able to use their water wells and instead [had to] rely on the Department of Energy to provide them with municipal water and the fact that they [were] prevented from installing new water wells as a result of the groundwater contamination").

Here, the claim that sulfates "are now present in [Plaintiffs'] soil and water at significant levels" plausibly establishes a demonstrable safety risk.  While Plaintiffs do not expressly detail the exact amount of sulfate present or its specific potential danger to health, in *Wilhite*, the court made clear that if PCBs had been present in higher concentrations, they would have created a health risk (and thereby substantially interfered with plaintiffs' use and enjoyment of the land). *See Wilhite*, 143 S.W.3d at 627.  As discussed *supra* Section III.B.2, Kentucky caselaw offers support for the notion that sulfate, if present in high enough concentrations, can contaminate drinking water and soil.  *See Star Run*, 350 S.W.3d 1; *see also Butki*, 274 Cal. Rptr. 909.  The

Amended Complaint alleges that, based on information and belief, sulfate is present in Plaintiffs' soil and water at "significant" amounts. This is enough at the pleading stage to reasonably support that sulfates have burdened Plaintiffs' property in sufficient quantities to diminish its value and interfere with Plaintiffs' full use and enjoyment of their land. *See Mod. Holdings*, 2015 WL 1481457, at *4 ("Plaintiffs [] pled on information and belief that 'more than a minute quantity [of pollutants], the extent of which is presently unknown,' caused their harm. . . . The complaint alleges that the hazardous substances have been discharged into the air and water and have migrated onto and 'physically invaded' Plaintiffs' property. Accepting these allegations as true, Plaintiffs' allegations regarding the type and extent of emissions are sufficiently specific to satisfy *Twombly*." (internal citation omitted)). Accordingly, the Court finds that Plaintiffs have plausibly alleged private nuisance. The prism is only the low *Twombly* bar, and again, a complaint does not require a fully proven claim.

### 5. Trespass

Plaintiffs' final count alleges that CSX committed both intentional and negligent trespass when it caused "toxic smoke to surround their homes, contaminated their soil and water with sulfates at high levels, intentionally dumped molten sulfur, and allowed off gassing to occur." *See* DE 31 at 36–37; DE 19 ¶¶ 148–54.

Trespass is an intended or negligent encroachment onto another's property, without the consent of the landowner. *Wilhite*, 143 S.W.3d at 619–20. "To support an action for trespass, an object or thing must actually enter the person's property and harm it." *Mod. Holdings*, 2015 WL 1481457, at *5 (quoting *Dickens v. Oxy Vinyls, LP*, 631 F. Supp. 2d 859, 864–65 (W.D. Ky. July 1, 2009)). When bringing a claim for intentional trespass, "[a]ny intended intrusion or encroachment which is not privileged is actionable without regard for the shortness of the period

34

of the interference, or the absence of pecuniary harm." *Smith*, 226 S.W.3d at 54. An intentional trespass may "be innocent, in that the trespasser believes he or she has a right to be on the land of another," and requires only that the trespasser made an "intentional act." *See Merrick v. Diageo Ams. Supply, Inc.*, 5 F. Supp. 3d 865, 879–80 (W.D. Ky. 2014) (citing *Hammonds v. Ingram Indus., Inc.*, 716 F.2d 365, 371 (6th Cir. 1983)). The emission of pollutants can constitute such an intentional act:

> Plaintiffs can state a claim for intentional trespass if they allege that an object or thing entered on and caused harm to their property. *Dickens,* 631 F.Supp.2d at 864–65. In their First Amended Complaint, Plaintiffs allege that "[a]s a direct and proximate result" of Defendant's conduct in operating its facilities, Defendant emitted ethanol that subsequently entered upon and physically invaded Plaintiffs' property. Plaintiffs further allege that "Defendant's actions were, and continue to be, intentional. . . ." Accepting these factual allegations as true, *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937, the court finds that Plaintiffs have sufficiently alleged an intentional wrongdoing on Diageo's part and have stated a claim for intentional trespass.

*Id.* at 880 (internal citations omitted). Applied here, Plaintiffs plausibly allege that CSX intentionally (a) dumped sulfates into surrounding soil and waterways, and (b) staged breached cars in Livingston for two months, open to the elements, after the derailment. This is enough to support a claim of intentional trespass.

Alternatively, a negligent trespass requires that "(1) the defendant must have breached its duty of due care (negligence); (2) the defendant caused a thing to enter the land of the plaintiff; and (3) the thing's presence causes harm to the land." *Wilhite*, 143 S.W.3d at 620. Plaintiffs have already plausibly alleged all three of these elements: (1) The Amended Complaint sufficiently alleges that CSX acted negligently when it unreasonably allowed its train to derail, break the containers, and emit hazardous $SO_2$ gas, *see supra* Section III.C.1; (2) this negligent emission of $SO_2$ caused the gas to spread throughout the surrounding area and onto Plaintiffs' property; and (3) this toxic gas invaded Plaintiffs' property in sufficiently large quantities to cause actual harm

35

to the land. *See supra* Sections III.B.2, III.C.4. Thus, Plaintiffs put forth a plausible trespass claim, and CSX's argument regarding the *extent* of damages or safety risks are more appropriately answered in the context of a fully developed record.

### 6. Punitive Damages

Finally, CSX disputes Plaintiffs' demand for punitive damages. *See* DE 19 ¶¶ 122, 132, 140, 147, 154. "For a plaintiff to recover punitive damages, the evidence must either satisfy the statutory standard found in KRS § 411.184(2) or the common law standard for gross negligence." *Morgan v. Rollins*, No. 6:20-cv-205-REW, 2023 WL 2438950, at *3 (E.D. Ky. Jan. 31, 2023) (citing *Saint Joseph Healthcare, Inc. v. Thomas*, 487 S.W.3d 864, 870 (Ky. 2016)). "Punitive damages are available so long as gross negligence is shown." *Clark v. Bucyrus Int'l*, No. 5:08-cv-434-JMH, 2010 WL 996471, at *7 (E.D. Ky. Mar. 17, 2010) (citing *Williams*, 972 S.W.2d at 262). As established above, Plaintiffs plausibly allege a gross negligence claim. *See supra* Section III.C.2. Thus, the Amended Complaint supports a prayer for punitive damages. Any vulnerabilities in the foundation for that remedy will be tested at summary judgment.

### D. CLASS ACTION ALLEGATIONS

Finally, the Court addresses CSX's motion to strike Plaintiffs' class allegations, which seek relief on behalf of "[a]ll natural persons who resided or were present or own property within fifteen miles of the CSX Train Derailment site in Rockcastle County, Kentucky on November 22, 2023." DE 19 ¶ 99 (with standard exceptions).

Federal Rule of Civil Procedure 23 governs class actions brought in federal court. "To obtain class certification, a claimant must satisfy two sets of requirements: (1) each of the four prerequisites under Rule 23(a), and (2) the prerequisites of one of the three types of class actions

provided for by Rule 23(b)." *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 945–46 (6th Cir. 2011). Plaintiffs here allege classes under both Rule 23(b)(2) and 23(b)(3). *See* DE 19 ¶ 102.

Rule 23(a) requires (1) *numerosity* ("the class is so numerous that joinder of all members is impracticable"); (2) *commonality* ("there are questions of law or fact common to the class"); (3) *typicality* ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) *adequate representation* ("the representative parties will fairly and adequately protect the interests of the class").

Rule 23(b)(2) and (b)(3) require, respectively, that:

> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
>> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>>
>> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>>
>> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>>
>> (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(2)–(3).

"Rule 23 does not set forth a mere pleading standard," and "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). In addition, "certification is proper only if 'the trial court is satisfied, after a rigorous analysis,'" that all prerequisites have been satisfied. *Id.* (quoting *Gen.*

*Tel. Co. v. Falcon*, 102 S. Ct. 2364, 2372 (1982)).  Pursuant to Rule 23(c)(1)(A), courts should make such a determination "[a]t an early practicable time."

Here, although Plaintiffs have not yet moved for certification, CSX seeks to strike the alleged class based on a failure to satisfy Rule 23(a)(1)'s numerosity requirement.  *See* DE 25-1 at 36–38.  A court may strike class allegations prior to a motion for certification when "the complaint itself demonstrates that the plaintiff cannot meet the requirements for maintaining a class action." *Johnson v. Geico Choice Ins. Co.*, No. 1:18-cv-1353, 2018 WL 6445617, at *4 (N.D. Ohio Dec. 10, 2018) (citing *Pilgrim*, 660 F.3d at 949 (6th Cir. 2011)).  "The moving party has the burden of demonstrating from the face of the plaintiffs' complaint that it will be impossible to certify the class as alleged, regardless of the facts plaintiffs may be able to prove [through discovery]." *Schilling v. Kenton Cnty.*, No. 2:10-cv-143-DLB, 2011 WL 293759, at *4 (E.D. Ky. Jan. 27, 2011) (citation omitted).

The Sixth Circuit has made clear that even at the pleading stage, district courts have a duty to "engag[e] in a 'rigorous analysis' of the question, and 'sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.'"  *Pilgrim*, 660 F.3d at 949 (quoting *Falcon*, 102 S. Ct. at 2372).  As a result, district courts exercise caution when analyzing the pleadings and usually "defer decision on class certification issues and allow discovery 'if the existing record is inadequate for resolving the relevant issues.'"  *Bearden v. Honeywell Int'l, Inc.*, 720 F. Supp. 2d 932, 942 (M.D. Tenn. 2010) (citing *In re Am. Med. Sys.*, 75 F.3d 1069, 1086 (6th Cir. 1996)); *see also, e.g.*, *Spencer v. JRN, Inc.*, No. 3:22-cv-24-GFVT, 2023 WL 2278644, at *4 (E.D. Ky. Feb. 28, 2023) (citing *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974)) ("Though procedurally permissible, striking a plaintiff's class allegations prior to discovery and a motion for class certification is a rare remedy."); *Nixon v.*

38

*Anthem, Inc.*, No. 3:19-cv-76-GFVT, 2021 WL 4037824, at *10 (E.D. Ky. Sept. 3, 2021) ("Given the Sixth Circuit's admonition to defer the certification determination until after discovery, . . . it is appropriate to decline to strike Plaintiffs' class allegations at this time."); *Geary v. Green Tree Serv., LLC*, No. 2:14-cv-00522, 2015 WL 1286347, at *17 (S.D. Ohio Mar. 20, 2015) ("The Court deems it prudent to assess the propriety of class certification in the context of a fully briefed class certification motion rather than in the context of a motion to strike class claims at the pleading stage.").

A numerosity analysis under Rule 23(a)(1) requires a fact-specific inquiry that considers not just the raw number of proposed class members, but also such factors as geographic breadth and the ease with which members can be identified and joined. *See Senter v. Gen Motors Corp.*, 532 F.2d 511, 523 n.24 (6th Cir. 1976). Plaintiffs argue numerosity is satisfied because the alleged class contains "hundreds of residents" who "are so numerous and geographically dispersed that the joinder of all members" would be impracticable. *See* DE 19 ¶ 103. In its motion to strike, CSX does not dispute the number of class members in isolation but instead contends that joinder of all members is practicable given there is "a crisply defined evacuation zone; a small geographic reach; [and] a discrete, one-time event producing all supposed harms." DE 25-1 at 38.[6] Certainly,

---

[6] Citing Federal Rule of Evidence 201, CSX moves the Court to take judicial notice of U.S. Census data showing Livingston with a 2020 population of 166 people. *See* DE 26 (Motion); *see also Livingston, Kentucky*, U.S. Census Bureau, https://data.census.gov/all?q=Livingston+city,+Kentucky (last visited Mar. 10, 2025). CSX cites this data as pertinent to Plaintiffs' claim that the class includes "hundreds" of members. *See* DE 25-1 at 37. Plaintiffs contest this request for notice, arguing that while the data otherwise meets FRE 201's requirements, it is irrelevant under FRE 401. *See* DE 32 (Response). Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence, and (b) the fact is of consequence in determining the action." FRE 401. Because the derailment occurred in Livingston, it necessarily follows that at least a portion of the town is encompassed within the alleged class's 15-mile geographic radius. Thus, knowledge of the town's population is helpful for gauging the class size—a consequential fact. *See Ringswald v. Cnty. of DuPage*, 196 F.R.D. 509, 511–12 (N.D. Ill. 2000) (taking judicial notice of census population data to help approximate and gauge the reasonableness of alleged class size). The Court therefore **GRANTS** DE 26 and takes judicial notice of Livingston's 2020 census population, though it notes that this fact does not impact the Court's ultimate ruling on the motion to strike.

the raw number of persons residing in the area matters. However, the Court also notes that there may be a delta between residents and owners, that the data precede the incident, and that the sought class also references persons "present" in the area during the plume. In a small target area bisected by I-75, that inclusion introduces a numerical wildcard.

In support of its argument, CSX cites extensively to *Turnage v. Norfolk S. Corp.*, 307 F. App'x 918 (6th Cir. 2009), a case that also involved a train derailment and subsequent chemical spill. There, the Sixth Circuit affirmed the district court's refusal to certify plaintiffs' proposed class due to its speculative size, the close geographic proximity of prospective class members, and the "discreet and obvious nature of the harm." *See id.* at 921–23.

Despite *Turnage*'s apparent factual similarities to the instant matter, multiple distinguishing factors limit its applicability here. First, *Turnage* was decided as a motion to certify (not as a motion to strike), *see id.* at 919, and the district court rejected the class only after plaintiffs were given multiple opportunities during discovery "to supply concrete evidence of numerosity if there were any such evidence to be had. *See id.* at 922. The Sixth Circuit also did not hold that certification of the class would have been necessarily improper, instead finding only that the district court did not abuse its "broad discretion to decide whether to certify a class." *Id.* at 921.

Thus, *Turnage* does not preclude certification of a class in connection with a chemical spill affecting a relatively small community, nor does it put forth a requirement that a Court make such a finding at this early stage. *See In re Paulsboro Derailment Cases*, No. 13-cv-784-RBK/KMW *et al.*, 2014 WL 1371712, at *8 (D.N.J. Apr. 8, 2014) ("Plaintiffs allege that at least 600 residents were affected by [a derailment and subsequent chemical spill]. Without affording plaintiffs the opportunity to rely on discovery[,] . . . it would be premature to decide that joinder of all of these 600 or more residents is practicable. Because facts relevant to this inquiry, such as the exact

number of class members and the amount at stake, are properly addressed in discovery, this issue will be determined on Plaintiffs' motion to certify the class.").

The Court therefore concludes that Plaintiffs should be given the opportunity to make their argument for class certification with the benefit of a developed record. Accordingly, it **DENIES** CSX's motion to strike and defers resolution of the issue until Plaintiffs' motion for class certification, on a record featuring sufficient discovery, has taken place.

## IV.    CONCLUSION

For the foregoing reasons, the Court:

(1) **GRANTS** DE 26 (Motion for Judicial Notice).

(2) **DENIES** DE 25's motion to strike class allegations.

(3) **GRANTS in part** and **DENIES in part** DE 25's motion to dismiss DE 19's claims. Specifically, the Court **DISMISSES** Count II of the Amended Complaint (Ultrahazardous Materials). Plaintiffs may proceed forward on all other claims.

This the 28th day of March, 2025.

Signed By:

_Robert E. Wier_

**United States District Judge**